AO 106 (Rev. 04/10) Application for a Search Warrant     AUTHORIZED AND APPROVED DATE: /s/ Danielle M. Connolly 06/02/2023

# UNITED STATES DISTRICT COURT
for the
Western District of Oklahoma

FILED
JUN 0 5 2023
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A black in color Apple iPhone 11, bearing serial number DX3FK40MN72Q.

Case No. M-23- 436 -AMG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms without a License |
| 18 U.S.C. § 933 | Trafficking in Firearms |

The application is based on these facts:
See attached Affidavit of Special Agent David J. McCauley, Jr., Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David J. McCauley, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/5/23

*Judge's signature*

City and state: Oklahoma City, Oklahoma

Amanda Maxfield Green, U.S. Magistrate Judge
*Printed name and title*

# THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, David J. McCauley, Jr., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession and further described in **Attachment A**, and the extraction from that property of electronically stored information described in **Attachment B**.

2. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so since June 2018. Prior to Employment with ATF, I was employed by the Hampton Police Department. I have been employed in law enforcement for twelve years. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy; as a result of my training and experience as an ATF Special Agent, I am familiar with Federal criminal laws. I am currently assigned to the Oklahoma City Field Office and am charged with investigating violations of Federal Law, including violations of the Gun Control Act of 1968, as amended (Title 18, United States Code, Sections 921, et seq.), explosives, arson, alcohol, and tobacco laws.

3. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants under the authority of the United States.

4. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for a cellular device: **a black in color Apple iPhone 11, bearing serial number DX3FK40MN72Q** (hereinafter, **Subject Device**), as described further in **Attachment A** (physical description), for evidence of violations of 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license) and 18 U.S.C. § 933 (trafficking in firearms), as described further in **Attachment B** (description of items to be seized). **Subject Device** is currently located in secure evidence storage at the ATF Oklahoma City Field Office, within the Western District of Oklahoma.

5. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## PROBABLE CAUSE

6. On June 13, 2022, Special Agent (SA) David McCauley received information regarding suspected illegal firearms sales at Mary's Swap Meet, a public flea market located at 7905 NE 23rd Street, Oklahoma City, Oklahoma, which is within the Western District of Oklahoma. Specifically, two separate individuals, independently of one another, indicated that two males, later identified as Phillip Niles Martin (MARTIN) and T.F., were selling firearms at Mary's Swap Meet at nearly twice their actual value. One party reported further that MARTIN and T.F. sold firearms with obliterated or filed off serial numbers as well, noting that they removed these particular firearms from their table when uniformed police officers were nearby.

7. SA McCauley opened an investigation into MARTIN and T.F. and determined that neither MARTIN nor T.F. is a licensed importer, licensed manufacturer, or licensed dealer of firearms.

8. SA McCauley conducted queries into ATF records regarding MARTIN and T.F. and learned that MARTIN was the subject of two previous investigations by the ATF Oklahoma City Field Office II. In 2013, MARTIN was suspected of dealing firearms without a license. He was given a verbal warning wherein he was advised that if he wanted to sell firearms, he needed to apply for a federal firearms license; however, even with a license, he could not deal firearms at Mary's Swap Meet. He acknowledged that he understood and advised that he would just sell ammunition and gun parts.

9. MARTIN came to ATF attention again in 2020, after a firearm that he had purchased was recovered at a crime scene in Mexico. On February 10, 2020, agents hand-delivered a cease-and-desist letter to MARTIN at his residence at 12609 Flagstone Court, Oklahoma City, Oklahoma. MARTIN signed the letter acknowledging its receipt and notification to stop dealing firearms in violation of federal law.

10. On July 23, 2022, agents surveilling MARTIN and T.F.'s activities at Mary's Swap Meet observed the two conducting the business of firearm and ammunition sales from a table there. They also observed a shed immediately behind the table, the doors of which were open with firearms attached thereto on display. Within the shed, agents observed multiple storage containers, which appeared to contain additional merchandise

for sale by MARTIN and T.F.[1]

11. On July 30, 2022, ATF agents acting in an undercover capacity made contact with MARTIN and T.F. at their table at Mary's Swap Meet, confirming their identities. During this interaction, an agent purchased a Taurus, model G3C, 9mm caliber pistol, bearing serial number ACM629688 for $550.00 from MARTIN and T.F., who were working in tandem. Notably, pistols of the same brand and model are typically priced at approximately $300.00 at most retail stores, including Bass Pro Shop and Academy Sports and Outdoors, two large firearms dealers operating and conducting business in the Western District of Oklahoma. In my training and experience, selling firearms for well in excess of their market value is evidence that the seller knows or has reason to believe that the individuals purchasing the firearms are not legally able to obtain them. An individual like MARTIN knows or has reason to know that the only reason why a person would purchase a gun at a swap meet from him for an amount greatly in excess of what it is otherwise worth at a retailer is the fact that the purchaser is unwilling or unable to legally purchase the firearm through the authorized dealer. Accordingly, I believe this fact, coupled with the other facts set forth herein, demonstrates that MARTIN is fully aware of the illegal nature of his business.

---

[1] Additional surveillance on July 30, 2022; November 5, 2022; January 28, 2023; and May 20, 2023, revealed a consistent manner of operation by MARTIN and his associates – firearms for sale on display on the table and affixed to the open doors of the shed, with multiple storage containers visible inside the shed. When agents conducted surveillance on May 13, 2023, MARTIN was not present at Mary's Swap Meet. The shed was instead secured with a lock bar and three security locks. Based upon my training and experience, I believe that the shed was secured because it contained valuable items, which may include ammunition, firearm parts and accessories, and possibly assembled firearms.

12. Although MARTIN claimed that the firearm was part of T.F.'s private collection, T.F. later advised the agent that it was new and had never been fired. When another agent remarked that the Taurus was the only one of its kind on the table, MARTIN told the agent to "come back tomorrow" and then offered to meet him in north Oklahoma City to sell him another Taurus.

13. On November 5, 2022, ATF agents acting in an undercover capacity purchased three additional firearms from MARTIN and T.F. at Mary's Swap Meet. Each was sold for considerably more than standard retail value.

14. On May 13, 2023, an ATF agent acting in an undercover capacity contacted MARTIN utilizing a telephone number from a business card that MARTIN provided during the July 2022 purchase referenced *supra*. Prior to the call, agents set up surveillance at MARTIN's residence and confirmed that MARTIN was at home and working in the garage.

15. The undercover agent conducted a recorded phone call to MARTIN and inquired about purchasing a firearm. MARTIN advised that he had a Taurus 9mm caliber pistol and told the undercover agent to meet him at the 7-Eleven at NW 122nd Street and Council – located at 12237 North Council Road, Oklahoma City, Oklahoma. This business is less than half of a mile from MARTIN's residence. Agents responded to the 7-Eleven to conduct surveillance.

16. At approximately 1:15 p.m., agents observed MARTIN drive away from his residence in a white 2017 Toyota 4Runner with bearing Oklahoma license plate IVN576. Upon arrival at the 7-Eleven, MARTIN met with the undercover agent and retrieved a

Taurus, model G3C, 9mm caliber pistol, bearing serial number ADB003971, from the vehicle. MARTIN also provided the agent with a 50-round box of Remington 9mm ammunition, which he withdrew from the rear seat of the vehicle. The agent paid MARTIN $500.00 for the firearm and ammunition. MARTIN encouraged the agent to come see him at Mary's Swap Meet to get more ammunition the following weekend.

17. On May 20, 2023, SA McCauley responded to Mary's Swap Meet and observed MARTIN and an unknown white male conducting business at the same location where they were previously observed selling firearms and ammunition.

18. On May 26, 2023, ATF SA Brian Anderson, a Firearms Interstate Nexus Examiner, examined the firearms purchased from MARTIN. It is his opinion based upon his observations that the firearms were not manufactured in Oklahoma and therefore crossed state lines to reach Oklahoma, thereby affecting interstate or foreign commerce.

19. On May 30, 2023, SA McCauley sought and obtained a criminal complaint and arrest warrant for MARTIN, as well as two related search warrants – one for MARTIN's residence, located at 12609 Flagstone Court, Oklahoma City, Oklahoma 73142, and the other for a storage shed located at Mary's Swap Meet at 7905 NE 23rd Street, Oklahoma City, Oklahoma 73141, which was utilized as a storefront by MARTIN.

20. On May 31, 2023, SA McCauley and ATF Oklahoma City Field Office agents executed the arrest and search warrants. MARTIN was located, detained, interviewed, and then arrested pursuant the complaint. During a post-*Miranda* interview MARTIN advised that he does sell firearms purchased by other individuals, confirming that he is involved in the unlicensed sale of and trafficking of firearms. During the

execution of the search warrant at the residence, agents located approximately 187 firearms, approximately $490,100.00 in U.S. currency, thousands of rounds of ammunition, as well as ledgers and receipts for the sale of firearms. Further, thousands of rounds of ammunition were seized from the storage shed, to which MARTIN provided the lock access codes.

21. MARTIN possessed the **Subject Device** during the execution of the warrants, which was seized from his bedroom. Based upon my training and experience, I am aware that individuals involved in the trafficking of firearms use electronic devices such as **Subject Device** to maintain contact with other co-conspirators, including suppliers, transporters, distributors, and purchasers of firearms, as well as to arrange for the purchase or transfer of firearms. Such devices and their associated memory cards commonly contain electronically stored information which constitutes evidence, fruits, and instrumentalities of drug trafficking offenses including, but not limited to, the phone directory and/or contacts list, calendar, text messages, e-mail messages, call logs, photographs, and videos.

22. **Subject Device** has been secured at the ATF Oklahoma City Field Office, stored in manner in which the contents, to the extent material to this investigation, are in substantially the same state as they were when the devices first came into the possession of the ATF. It has remained in secured property at the ATF Oklahoma City Field Office within the Western District of Oklahoma.

## TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage

medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each

satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may

also include global positioning system ("GPS") technology for determining the location of the device.

24. Based on my training, and experience, I know that **Subject Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in **Attachment B**, this Application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Subject Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also

            indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to

employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

28.  *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.  I submit that this Affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Device** described in **Attachment A** to seek the items described in **Attachment B**.

Respectfully submitted,

DAVID J. McCAULEY, JR.
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on this  5th  day of June, 2023

AMANDA MAXFIELD GREEN
United States Magistrate Judge

## ATTACHMENT A

1. The property to be search is **a black in color Apple iPhone 11, bearing serial number DX3FK40MN72Q** (hereinafter, **Subject Device**), which is currently located in secure storage at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Field Office within the Western District of Oklahoma. **Subject Device** is depicted below:



2. This warrant authorizes the forensic examination of **Subject Device** for the purpose of identifying the electronically stored information described in **Attachment B**.

## ATTACHMENT B

1. All records on the **Subject Device**, described in **Attachment A**, that relate to violations of 18 U.S.C. §§ 922(a)(1)(A) and 933 involving **MARTIN** including:

    a.    electronically stored information, including, but not limited to the phone directory and/or contact list, calendar, text messages, multi-media messages, email messages, call logs, photographs, and videos;

    b.    any location data indicating the whereabouts of **Subject Device**;

    c.    any information related **MARTIN**'s schedule or travel;

    d.    any photographs of firearms;

    e.    any photographs of stolen property;

    f.    any phone records between known or unknown co-conspirators, including between **MARTIN** and T.F.;

    g.    any text messages, instant messages, or electronic messages communicating between known or unknown co-conspirators, including **SHARIF** and T.F.;

    h.    any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information); and

    i.    any bank records, checks, credit card bills, account information, and other financial records, including financial records within applications such as CashApp.

2. Evidence of user attribution showing who used or owned the **Subject Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history:

    a.    records of Internet Protocol addresses used;

    b.    records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search

terms that entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.